James E. Cecchi
Donald A. Ecklund
CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.
5 Becker Farm Road
Roseland, NJ 07068
Tel:  (973) 994-1700
Fax:  (973) 994-1744
jcecchi@carellabyrne.com
decklund@carellabyrne.com

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| SUE KATTUAH, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>GALENA BIOPHARMA, INC., MARK J. AHN, MARK W. SCHWARTZ, RYAN M. DUNLAP, and JOHN T. BURNS,<br><br>Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

Plaintiff Sue Kattuah ("Plaintiff"), by and through her attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Galena Biopharma, Inc., ("Galena" or the "Company"), with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Galena; and (c) review of other publicly available information concerning Galena.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a class action on behalf of persons and entities that acquired Galena's securities between August 11, 2014, and January 31, 2017, inclusive (the "Class Period"), against the Defendants,[1] seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Galena is a biopharmaceutical company that develops hematology and oncology therapeutics.

3.      On October 3, 2013, the Company announced the product launch of Abstral (fentanyl) Sublingual Tablets, a drug designed to address breakthrough cancer pain.  The Abstral formulation purportedly delivered micronized fentanyl in a convenient sublingual tablet which was designed to dissolve under the tongue in seconds and provide relief from breakthrough pain within minutes.

4.      On November 9, 2015, Galena announced that it decided to divest its commercial business, which included Abstral.  As such, the Company's commercial business activities were classified as "discontinued operations," and Galena stated that it anticipated exiting the commercial business by the end of the first quarter of 2016.

5.      On this news, the price of Galena common stock fell $0.19 per share, or 11%, to

---

[1] "Defendants" refers to Galena, Mark J. Ahn, Mark W. Schwartz, Ryan M. Dunlap, and John T. Burns, collectively.

close at $1.53 per share on November 10, 2015.

6.    On November 20, 2015, the Company announced that it had sold its Abstral product to a private company in a deal valued at up to $12 million, with $8 million cash up-front, and up to $4 million in additional cash upon the achievement of certain sales milestones, effective as of November 19, 2015.

7.    On December 11, 2015, the Company announced the departure of the Company's then Chief Financial Officer ("CFO"), Ryan Dunlap, effective December 31, 2015.

8.    On December 22, 2015, the Company announced that it received a subpoena from the U.S. Attorney's Office for the District of New Jersey requesting the production of a broad range of documents pertaining to marketing and promotional practices related to Abstral.

9.    On this news, the price of Galena common stock fell $0.06 per share, or 3.6%, to close at $1.57 per share on December 23, 2015.

10.    Then, on March 10, 2016, the Company filed its annual report on Form 10-K with the SEC.    Therein, the Company disclosed that "Our former commercial operations and development programs are subject to various U.S. federal and state fraud and abuse laws, including, without limitation, the federal False Claims Act, federal Anti-Kickback Statute, and the federal Sunshine Act."    The Company provided additional detail, stating that "[a] federal investigation of two of the high-prescribing physicians for Abstral has resulted in the criminal prosecution of the two physicians for alleged violations of the federal False Claims Act and other federal statutes," and that the Company had received a trial subpoena for documents in connection with that investigation and had been in contact with the U.S. Attorney's Office for the Southern District of Alabama, which was handling the criminal trial.    The Company further stated that "other governmental agencies may be investigating our Abstral promotion practices," and that "on December 16, 2015, we received a subpoena issued by the U.S. Attorney's Office in District of New Jersey requesting the production of a broad range of documents pertaining to our marketing and promotional practices for Abstral."

11.    On this news, the price of Galena common stock fell $0.03 per share, or 3.3%, to

close at $0.86 per share on March 11, 2016.

12.     On January 9, 2017, the Company filed a Form 8-K with the SEC.  Therein, the Company disclosed that the investigation being undertaken by the U.S. Attorney's Office for the District of New Jersey and Department of Justice was a criminal investigation in addition to a civil investigation that could ultimately involve the Company as well as one or more current and/or former employees, and that, pursuant to the Company's charter, it was reimbursing any former and current employees' attorney's fees with respect to the investigation.

13.     On this news, the price of Galena common stock fell $0.04 per share, or 1.9%, to close at $2.03 per share on January 9, 2017.

14.     On January 31, 2017, the Company announced the resignation of Mark W. Schwartz as President, Chief Executive Officer ("CEO"), and a member of the Board of Directors.

15.     On this news, the price of Galena common stock fell $0.37 per share, or 22.4%, to close at $1.28 per share on February 1, 2017.[2]  The stock price continued to decline, falling another $0.16 per share, or 12.5%, to close at $1.12 on February 2, 2017.

16.     Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose: (1) that the Company violated various statutes in connection with its sales of Abstral; (2) that, as such, the Company was exposed to civil and criminal liability; and (3) that, as a result of the foregoing, Defendants' statements about Galena's business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

17.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

---

[2] The Company executed a 1-for-20 reverse stock split on November 11, 2016.  All prices after that date in this complaint are the post-split prices.

## JURISDICTION AND VENUE

18.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

19.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

20.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

21.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

22.     Plaintiff Sue Kattuah, as set forth in the accompanying certification, incorporated by reference herein, purchased Galena common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

23.     Defendant Galena Biopharma, Inc. is a Delaware corporation headquartered in San Ramon, California.  Galena's common stock trades on the NASDAQ Stock Market ("NASDAQ") under the symbol "GALE."

24.     Defendant Mark J. Ahn ("Ahn") was the President, CEO, and a Director of Galena at all relevant times until his resignation effective August 20, 2014.

25.     Defendant Mark W. Schwartz ("Schwartz") was the President, and CEO of Galena from August 20, 2014, through the end of the Class Period.

26.     Defendant Ryan M. Dunlap ("Dunlap") was the Vice President, and CFO of Galena from prior to the beginning of the Class Period until his resignation effective December 31, 2015.

27.     Defendant John T. Burns ("Burns") was the Principal Accounting Officer of Galena from February 23, 2016, through the end of the Class Period, and the Controller of Galena from June 2015 through the end of the Class period.

28.     Defendants Ahn, Schwartz, Dunlap, and Burns (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of Galena's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.   The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

29.     Galena is a biopharmaceutical company that develops hematology and oncology therapeutics.

30.     On October 3, 2013, the Company announced the product launch of Abstral (fentanyl) Sublingual Tablets, a drug designed to address breakthrough cancer pain.  The Abstral formulation purportedly delivered micronized fentanyl in a convenient sublingual tablet which was designed to dissolve under the tongue in seconds and provide relief from breakthrough pain within minutes.

## Materially False and Misleading
## Statements Issued During the Class Period

31.    The Class Period begins on August 11, 2014.  On that day, the Company issued a press release entitled "Galena Biopharma Reports Second Quarter 2014 Results."  Therein, the Company, in relevant part, stated:

> PORTLAND, Ore., Aug. 11, 2014 (GLOBE NEWSWIRE) -- Galena Biopharma, Inc. (Nasdaq:GALE), a biopharmaceutical company developing and commercializing innovative, targeted oncology treatments that address major unmet medical needs to advance cancer care, today reported its financial results for the quarter ended June 30, 2014 and provided a business update.

> "With the recent acquisition of our second approved product, Zuplenz, Galena now has two commercial products and three clinical assets in development, providing our shareholders a stratified and diversified pipeline as we look to enhance cancer care and treat its often debilitating side-effects," said Mark J. Ahn, Ph.D., President and Chief Executive Officer. "We are excited for the second half of the year as we continue to advance all of our programs. Our two, key expected milestones in clinical development are completion of enrollment activities in our international, Phase 3 NeuVax PRESENT study, and the initiation of the Phase 2 clinical trial with GALE-401. Commercially, we continue to gain traction with Abstral, and we have begun preparations for the launch of Zuplenz in early 2015."

> *       *       *

> **Second Quarter 2014 Financial Highlights**

> Net revenue for the three months ended June 30, 2014 was $2.3 million and $4.5 million for the first half of 2014, compared to no net revenue for the six months ended June 30, 2013. Cost of revenue and gross margin were $0.3 million and $2.0 million, respectively, for the three months ended June 30, 2014. Of the net revenue, approximately $0.9 million was attributable to an order from one of the principal customers of Galena. The timing and amount of the order could cause a corresponding reduction in orders from this customer, and in related revenue, in the third quarter of 2014.

> Operating loss for the three months ended June 30, 2014 was $15.8 million, including $1.5 million in stock-based compensation charges, compared to $11.8 million, including $1.7 million in stock-based compensation charges, for the three months ended March 31, 2014, and $8.0 million, including $0.5 million in stock-based compensation charges, for the three months ended June 30, 2013.

> Galena also incurs non-cash income and expense related to changes in the fair value estimates of the Company's warrant liabilities. Non-cash expense related to the change in warrant values for the three months ended June 30, 2014 was $3.4 million compared to non-cash income of $9.8 million for the three months ended March 31, 2014, and non-cash expense of $0.5 million for the three months ended June 30, 2013.

> Net loss for the three months ended June 30, 2014 was $19.9 million, or $0.17 per basic and diluted share, compared to a net loss of $2.5 million, or $0.02 per basic

and diluted share, for the three months ended March 31, 2014, and a net loss of $9.6 million, or $0.11 per basic and diluted share, for the three months ended June 30, 2013.

As of June 30, 2014, Galena had cash and cash equivalents of $39.2 million, compared with $47.8 million as of December 31, 2013.

32.    On the same day, August 11, 2014, the Company filed its quarterly report on form 10-Q with the SEC.  The 10-Q was signed by Defendants Ahn and Dunlap, and reaffirmed the Company's financial results announced in the press release issued the same day.

33.    On November 3, 2014, the Company issued a press release entitled "Galena Biopharma Reports Third Quarter 2014 Results."  Therein, the Company, in relevant part, stated:

PORTLAND, Ore., Nov. 3, 2014 (GLOBE NEWSWIRE) -- Galena Biopharma, Inc. (Nasdaq:GALE), a biopharmaceutical company developing and commercializing innovative, targeted oncology treatments that address major unmet medical needs to advance cancer care, today reported its financial results for the quarter ended September 30, 2014 and provided a business update.

"The company continues to make excellent progress on our clinical programs, and we continue to build our commercial franchise," said Mark W. Schwartz, Ph.D., President and Chief Executive Officer. "I believe we have turned the corner on the corporate challenges we faced this year, and we are fully focused on the progress of NeuVax™ and its portfolio of clinical trials, our development pipeline and our commercial programs including the upcoming launch of Zuplenz®. Over the next six months, we will report results from the ongoing trials with GALE-301 and GALE-401, and our NeuVax platform will expand with the initiation of two new trials plus the completion of enrollment in our pivotal, Phase 3 PRESENT study. The launch of Zuplenz in Q1 2015 enhances our commercialization efforts and we believe we will see significant sales growth for that business line in 2015."

*        *        *

**Financial Highlights**

Net revenue for the third quarter of 2014 was $1.6 million compared to $1.2 million for the third quarter of 2013, an increase of 25%. Net revenue for the nine months ended September 30, 2014 was $6.1 million. The third quarter of 2013 was the first quarter that the company generated net revenue.

Operating loss for the three months ended September 30, 2014 was $13.2 million, including $1.3 million in stock-based compensation charges, compared to $6.9 million, including $0.5 million in stock-based compensation charges, for the three months ended September 30, 2013.

Galena also incurs non-cash income and expense related to changes in the fair value estimates of the Company's warrant liabilities. Non-cash income related to the change in warrant values for the three months ended September 30, 2014 was $6.7 million compared to non-cash expense of $1.6 million for the three months ended September 30, 2013.

Net loss for the three months ended September 30, 2014 was $6.2 million, or $0.05 per basic and diluted share, compared to a net loss of $9.3 million, or $0.11 per basic and diluted share, for the three months ended September 30, 2013.

As of September 30, 2014, Galena had cash and cash equivalents of $24.6 million, compared with $47.8 million as of December 31, 2013.

34.     On November 5, 2014, the Company filed its quarterly report on form 10-Q with the SEC.  The 10-Q was signed by Defendants Schwartz and Dunlap, and reaffirmed the Company's financial results announced in the press release issued on November 3, 2014.

35.     On March 5, 2015, the Company issued a press release entitled "Galena Biopharma Reports Fourth Quarter and Year End 2014 Financial Results."   Therein, the Company, in relevant part, stated:

PORTLAND, Ore., March 5, 2015 (GLOBE NEWSWIRE) -- Galena Biopharma, Inc. (Nasdaq:GALE), a biopharmaceutical company developing and commercializing innovative, targeted oncology therapeutics that address major medical needs across the full spectrum of cancer care, today reported its financial results for the quarter and year ended December 31, 2014 and provided a business update.

"The advances we made across all of our programs in 2014 were substantial, and I am looking forward to a very positive and productive 2015 for Galena," said Mark W. Schwartz, Ph.D., President and Chief Executive Officer. "Galena is unique among oncology-focused biopharmaceutical companies of our size in that we possess an extensive development pipeline complemented by an established commercial enterprise, providing the company with multiple opportunities to create value in both the near and longer terms. The Phase 3 PRESENT clinical trial for NeuVax remains the centerpiece of our clinical strategy, and we are very pleased to have recently reported the enrollment of the 700th patient into the study, and look forward to completing enrollment near the end of the quarter. Looking ahead, we expect to reach our event-driven, interim analysis at the end of 2015/early 2016 timeframe with a top-line data readout anticipated in 2018."

Dr. Schwartz continued, "As we continue to advance the PRESENT clinical trial, we expect to reach a number of key milestones with our additional immunotherapy programs, including readouts on our NeuVax combination trials with Herceptin® and top line data from our GALE-301 clinical trial. Additionally, we anticipate the commercial arm of our business to continue to grow revenue, while enhancing our relationships in the oncology community as our development pipeline advances. As reported today, we recorded our strongest Abstral quarter to date, hitting above the middle of our guidance range for the year, and with the addition of our second commercial product in Zuplenz, we expect to nearly double our overall commercial sales in 2015."

Dr. Schwartz concluded, "Our commercial and clinical teams have done a tremendous job over the past year to advance our multiple programs. As I assess our company, I am not only excited about the next 6-12 months, but for the long-

term prospects of Galena Biopharma."

\*        \*        \*

## FINANCIAL HIGHLIGHTS AND GUIDANCE

"2014 was a productive year for Galena with significant advances in our pipeline and commercial operations. We are pleased to report $9.3 million net revenue for Abstral which is consistent with our guidance of $8 to $10 million for 2014. We expect net revenue to increase throughout 2015 based on increased Abstral demand combined with the launch of our second commercial product, Zuplenz. We reiterate confidence in our net revenue guidance of $15-$18 million for 2015 for our commercial operations," added Ryan Dunlap, CPA, Vice President and Chief Financial Officer.

The company recognizes revenue from the sale of Abstral to wholesale pharmaceutical distributors, net of product-related discounts, allowances, product returns, rebates, chargebacks, and patient assistance benefits, as applicable. Net revenue was $3.2 million in the fourth quarter of 2014 and $9.3 million for the year ended December 31, 2014, compared to $1.3 million and $2.5 million, respectively, for the same periods of 2013.

Operating loss for the fourth quarter of 2014 was $11.4 million, including $1.0 million in stock based compensation, and $52.2 million, including $5.4 million in stock-based compensation charges, for the year ended December 31, 2014, compared to $12.4 million, including $1.6 million in stock-based compensation, and $33.8 million, including $2.9 million in stock based compensation, respectively, for the same periods in 2013. The increase in net operating loss year-over-year is primarily the result of our increased activity and enrollment in our Phase 3 PRESENT trial for NeuVax, our investigator sponsored trials for NeuVax, and our Phase 2 trial for GALE-401, as well as increased selling and marketing expenses associated with the growth of our commercial activities.

Other income or expense includes non-cash charges related to changes in the fair value estimates of the company's warrant liabilities and contingent purchase price liability, and the realized gain from the sale of marketable securities. The non-cash benefit related to the changes in values of our warrant and contingent purchase price liabilities for the fourth quarter of 2014 was $3.6 million and $16.7 million for the year ended December 2014, versus non-cash charges of $37.2 million and $44.9 million, respectively, for the same periods in 2013, respectively.

Net loss for the fourth quarter of 2014 was $8.0 million, including $3.6 million in a non-cash benefit described above, and a net loss of $36.6 million, including a $16.7 million non-cash benefit, for the year ended December 31, 2014, or $0.06 and $0.31 per basic and diluted share, respectively. Net loss for the fourth quarter of 2013 was $48.5 million, including $34.7 million of non-cash charges described above, and a net loss of $76.7 million, including $41.0 million of non-cash charges for the year ended December 31, 2013 or $0.46 and $0.85 per basic and diluted share, respectively.

On November 20, 2014 we announced the execution of a purchase agreement for up to $55.0 million with Lincoln Park Capital Fund ("LPC"). During the fourth quarter of 2014, we utilized the LPC agreement, as well as the At Market Issuance Sale Agreement ("ATM") announced in 2013, to raise approximately $10.7

million through the sale of 6.6 million common shares, at a weighted average discount to market of approximately 8%. No warrants were issued in connection with these financing arrangements.

As of December 31, 2014, Galena had cash and cash equivalents of $23.7 million, compared with $47.8 million as of December 31, 2013, and $24.7 million at the end of the third quarter of 2014. The $1.0 million change in cash during the fourth quarter represents $10.7 million in cash used for operating activities, and $0.1 million in cash used in investing activities, and $0.9 million in debt service payments, offset by $10.7 million in cash raised using the aforementioned LPC agreement and ATM facilities.

## COMMERCIAL HIGHLIGHTS

**Achieved Abstral® (fentanyl) Sublingual Tablets net revenue of $9.3 million, within the 2014 guidance of $8-$10 million for the first full year of sales.** Abstral is FDA approved, and is a sublingual (under the tongue) fentanyl tablet indicated only for the management of breakthrough pain in patients with cancer, 18 years of age and older, who are already receiving, and who are tolerant to, opioid therapy for their persistent baseline cancer pain.

36.     On the same day, March 5, 2015, the Company filed its annual report on form 10-K with the SEC.  The 10-K was signed by Defendants Schwartz and Dunlap, and reaffirmed the Company's financial results announced in the press release issued on the same day.

37.     On May 7, 2015, the Company issued a press release entitled "Galena Biopharma Reports First Quarter 2015 Financial Results."  Therein, the Company, in relevant part, stated:

PORTLAND, Ore., May 7, 2015 (GLOBE NEWSWIRE) -- Galena Biopharma, Inc. (Nasdaq:GALE), a biopharmaceutical company developing and commercializing innovative, targeted oncology therapeutics that address major medical needs across the full spectrum of cancer care, today reported its financial results for the quarter ended March 31, 2015 and provided a business update.

"We achieved two critical milestones thus far this year with completion of enrollment in our Phase 3 PRESENT trial and the closing of a public offering to solidify our balance sheet," said Mark W. Schwartz, Ph.D., President and Chief Executive Officer. "Together, these events demonstrate Galena's near-term and longer-range value proposition as we continue to advance the Company's development and commercial operations to capitalize on significant treatment opportunities within the oncology setting."

Dr. Schwartz continued, "Completing enrollment and over-enrolling our PRESENT trial is a major accomplishment for Galena. We are now focused on treating and monitoring the 758 patients in this Phase 3 trial as we progress towards our event-driven, interim analysis at the end of this year or in the first quarter of 2016. The ongoing advancement of our NeuVax and GALE-301 programs showcase the significant potential of our cancer immunotherapy programs that are designed to harness the power of the immune system to prevent a patient's cancer from returning. To do this effectively, we are treating women in the adjuvant setting whose immune systems have returned to a healthy status after

having received their cancer treatments, giving NeuVax and GALE-301 the best opportunity to make a difference."

Dr. Schwartz concluded, "Dovetailing the clinical successes during the quarter, the financing that we secured in March was an important achievement for Galena as it provides us the flexibility to advance our development programs and to strengthen our commercial efforts. Our immunotherapy platform has multiple clinical trials ongoing and we look forward to key data readouts from these trials over the next year. Meanwhile, on the commercial front, Abstral sales remain on target, our oncology presence continues to grow, and we reiterate our full year guidance of $15-$18 million for 2015. Additionally, we are now preparing to launch Zuplenz in July, adding a second, supportive care commercial product to our oncology-focused sales portfolio. In total, we have established a strong foundation with our development programs supported by our commercial franchise, and we remain committed to the growth of our company."

*     *     *

## FINANCIAL HIGHLIGHTS AND GUIDANCE

We recognize revenue from the sale of Abstral to wholesale pharmaceutical distributors, net of product-related discounts, allowances, product returns, rebates, chargebacks, and patient assistance benefits, as applicable. Net revenue was $2.8 million in the first quarter of 2015, a 28% increase compared to $2.2 million for the same period a year ago.

Operating loss for the first quarter of 2015 was $11.1 million, including $0.6 million in stock based compensation, compared to an operating loss of $11.8 million, including $1.7 million in stock-based compensation for the same period in 2014. The decrease in net operating loss year-over-year is primarily the result of the completion of enrollment in our Phase 3 PRESENT trial for NeuVax, as well as the decrease in stock based compensation.

Other income or expenses include non-cash charges related to changes in the fair value estimates of the company's warrant liabilities and contingent purchase price liability, and the realized gain from the sale of marketable securities. The non-cash benefit related to the changes in the value of our warrant liability for the first quarter of 2015 was $1.2 million for the three months ended March 31, 2015, versus a non-cash benefit of $9.8 million for the same period in 2014, respectively.

Net loss for the first quarter of 2015 was $10.5 million, including $1.2 million in a non-cash benefit described above, or $0.08 per basic and diluted share. Net loss for the first quarter of 2014 was $2.5 million, including a $9.8 million non-cash benefit described above, or $0.02 per basic and diluted share.

On March 18, 2015, we announced the closing of our underwritten public offering of 24,358,974 shares of common stock and 12,179,487 warrants to purchase our common stock at an exercise price of $2.08. The underwriters also exercised their over-allotment option to purchase warrants to purchase an aggregate of 1,826,923 shares of our common stock. On April 10, 2015 the underwriters exercised their option to purchase an additional 3,653,846 shares of common stock for additional net proceeds of $5.4 million. The total net proceeds to us from the March 2015 offering were approximately $40.8 million. Also, during January and February of

2015 we raised $6.6 million under the Lincoln Park and ATM agreements, resulting in a total cash raise of $47.4 million during the first quarter of 2015 and through today.

As of March 31, 2015, Galena had cash and cash equivalents of $52.9 million, compared with $23.7 million as of December 31, 2014. The $29.2 million increase in cash during the first quarter represents the aforementioned cash raised from issuance of common stock (excluding the April overallotment exercise), partially offset by $11.6 million used in operating activities, $0.5 million milestone payment for Zuplenz, and $0.9 million in debt service payments.

38.    On the same day, May 7, 2015, the Company filed its quarterly report on form 10-Q with the SEC.  The 10-Q was signed by Defendants Schwartz and Dunlap, and reaffirmed the Company's financial results announced in the press release issued on the same day.

39.    On August 6, 2015, the Company issued a press release entitled "Galena Biopharma Reports Second Quarter 2015 Financial Results."  Therein, the Company, in relevant part, stated:

PORTLAND, Ore., Aug. 6, 2015 (GLOBE NEWSWIRE) -- Galena Biopharma, Inc. (NASDAQ:GALE), a biopharmaceutical company developing and commercializing innovative, targeted oncology therapeutics that address major medical needs across the full spectrum of cancer care, today reported its financial results for the quarter ended June 30, 2015 and provided a business update.

"With our balance sheet strengthened, we made significant clinical progress in the second quarter as we reached a critical milestone with completion of enrollment in our Phase 3 PRESENT trial and had promising data readouts from two of our Phase 2 clinical trials with GALE-301 and GALE-401," said Mark W. Schwartz, Ph.D., President and Chief Executive Officer. "Our cancer immunotherapy programs continue to advance with our multiple NeuVax programs as well as with GALE-301. Our early Phase 2a data with GALE-301 in ovarian and endometrial cancer was positive, and we will present a more mature data set at the European Society for Medical Oncology Congress in September. In addition, we presented preliminary Phase 2 data on our hematology asset, GALE-401, at the European Hematology Association Congress demonstrating encouraging efficacy and safety data. We expect to present final data from the GALE-401 Phase 2 trial later this year."

Dr. Schwartz added, "On the commercial side of our business, last week we launched Zuplenz within our existing commercial infrastructure to treat patients suffering from nausea and vomiting as a result of their chemotherapy, radiation and surgical treatments. And, today we reported improved Abstral sales quarter over quarter resulting in our strongest net revenue quarter to date. Based on current projections, we anticipate that we will come in closer to the lower end of our guidance range, at around $15 million for the year."

\*       \*       \*

**FINANCIAL HIGHLIGHTS AND GUIDANCE**

We recognize revenue from the sale of Abstral to wholesale pharmaceutical distributors, net of product-related discounts, allowances, product returns, rebates, chargebacks, and patient assistance benefits, as applicable. Because the launch of Zuplenz occurred in July, there is no revenue recorded for Zuplenz through Q2, 2015, and all revenue to date is from Abstral sales. Net revenue was $3.4 million in the second quarter of 2015, a 48% increase compared to $2.3 million reported for the same period in 2014. Net revenue was $6.1 million in the first half of 2015, a 36% increase compared to $4.5 million reported for the same period in 2014.

Operating loss for the second quarter of 2015 was $11.3 million, including $0.6 million in stock based compensation, compared to an operating loss of $15.8 million, including $1.5 million in stock-based compensation for the same period last year. Operating loss for the first half of 2015 was $22.4 million, including $1.3 million in stock based compensation, compared to an operating loss of $27.6 million, including $3.2 million in stock-based compensation for the same period in 2014. The decrease in net operating loss year-over-year is primarily the result of the completion of enrollment in our Phase 3 PRESENT trial for NeuVax, as well as the decrease in stock based compensation and professional fees associated with ongoing legal proceedings.

Non-operating income or expenses include non-cash charges related to changes in the fair value estimates of the company's warrant liabilities, contingent purchase price liability, and interest expense. The non-cash expense related to the changes in the value of our warrant liability for the second quarter of 2015 was $4.3 million versus a non-cash expense of $3.4 million for the same period in 2014, respectively. The non-cash expense related to the changes in the value of our warrant liability for the first half of 2015 was $3.1 million versus a non-cash benefit of $6.4 million for the same period in 2014, respectively.

Net loss for the second quarter of 2015 was $15.7 million, including $4.3 million in a non-cash expense described above, or $0.10 per basic and diluted share. Net loss for the second quarter of 2014 was $19.9 million, including a $3.4 million non-cash expense described above, or $0.17 per basic and diluted share. The lower net loss this quarter compared to the same quarter last year is a function of the lower operating loss, partially offset by the increase in the non-cash loss on the change in our warrant values, as described above. Net loss for the first half of 2015 was $26.2 million, including $3.1 million in a non-cash expense described above, or $0.18 per basic and diluted share. Net loss for the first half of 2014 was $22.5 million, including a $6.4 million non-cash benefit described above, or $0.19 per basic and diluted share. The higher net loss through the first two quarters of this year compared to the same period last year is a function of the lower operating loss, which was more than offset by the non-cash loss on the change in our warrant values this year, compared to a non-cash gain last year, as described above.

As of June 30, 2015, Galena had cash and cash equivalents of $45.3 million, compared with $23.7 million as of December 31, 2014. The $21.6 million increase in cash during the first half of 2015 represents $47.4 million raised from issuance of common stock, partially offset by $23.4 million used in operating activities, a $0.5 million milestone payment for Zuplenz, and $1.9 million in debt service payments.

40.     On the same day, August 6, 2015, the Company filed its quarterly report on form 10-Q with the SEC.  The 10-Q was signed by Defendants Schwartz and Dunlap, and reaffirmed the Company's financial results announced in the press release issued on the same day.

41.     On August 6, 2015, the Company issued a press release entitled "Galena Biopharma Reports Second Quarter 2015 Financial Results."  Therein, the Company, in relevant part, stated:

> PORTLAND, Ore., Aug. 6, 2015 (GLOBE NEWSWIRE) -- Galena Biopharma, Inc. (NASDAQ:GALE), a biopharmaceutical company developing and commercializing innovative, targeted oncology therapeutics that address major medical needs across the full spectrum of cancer care, today reported its financial results for the quarter ended June 30, 2015 and provided a business update.
>
> "With our balance sheet strengthened, we made significant clinical progress in the second quarter as we reached a critical milestone with completion of enrollment in our Phase 3 PRESENT trial and had promising data readouts from two of our Phase 2 clinical trials with GALE-301 and GALE-401," said Mark W. Schwartz, Ph.D., President and Chief Executive Officer. "Our cancer immunotherapy programs continue to advance with our multiple NeuVax programs as well as with GALE-301. Our early Phase 2a data with GALE-301 in ovarian and endometrial cancer was positive, and we will present a more mature data set at the European Society for Medical Oncology Congress in September. In addition, we presented preliminary Phase 2 data on our hematology asset, GALE-401, at the European Hematology Association Congress demonstrating encouraging efficacy and safety data. We expect to present final data from the GALE-401 Phase 2 trial later this year."
>
> Dr. Schwartz added, "On the commercial side of our business, last week we launched Zuplenz within our existing commercial infrastructure to treat patients suffering from nausea and vomiting as a result of their chemotherapy, radiation and surgical treatments. And, today we reported improved Abstral sales quarter over quarter resulting in our strongest net revenue quarter to date. Based on current projections, we anticipate that we will come in closer to the lower end of our guidance range, at around $15 million for the year."
>
> *     *     *
>
> **FINANCIAL HIGHLIGHTS AND GUIDANCE**
>
> We recognize revenue from the sale of Abstral to wholesale pharmaceutical distributors, net of product-related discounts, allowances, product returns, rebates, chargebacks, and patient assistance benefits, as applicable. Because the launch of Zuplenz occurred in July, there is no revenue recorded for Zuplenz through Q2, 2015, and all revenue to date is from Abstral sales. Net revenue was $3.4 million in the second quarter of 2015, a 48% increase compared to $2.3 million reported for the same period in 2014. Net revenue was $6.1 million in the first half of 2015, a 36% increase compared to $4.5 million reported for the same period in 2014.
>
> Operating loss for the second quarter of 2015 was $11.3 million, including $0.6

million in stock based compensation, compared to an operating loss of $15.8 million, including $1.5 million in stock-based compensation for the same period last year. Operating loss for the first half of 2015 was $22.4 million, including $1.3 million in stock based compensation, compared to an operating loss of $27.6 million, including $3.2 million in stock-based compensation for the same period in 2014. The decrease in net operating loss year-over-year is primarily the result of the completion of enrollment in our Phase 3 PRESENT trial for NeuVax, as well as the decrease in stock based compensation and professional fees associated with ongoing legal proceedings.

Non-operating income or expenses include non-cash charges related to changes in the fair value estimates of the company's warrant liabilities, contingent purchase price liability, and interest expense. The non-cash expense related to the changes in the value of our warrant liability for the second quarter of 2015 was $4.3 million versus a non-cash expense of $3.4 million for the same period in 2014, respectively. The non-cash expense related to the changes in the value of our warrant liability for the first half of 2015 was $3.1 million versus a non-cash benefit of $6.4 million for the same period in 2014, respectively.

Net loss for the second quarter of 2015 was $15.7 million, including $4.3 million in a non-cash expense described above, or $0.10 per basic and diluted share. Net loss for the second quarter of 2014 was $19.9 million, including a $3.4 million non-cash expense described above, or $0.17 per basic and diluted share. The lower net loss this quarter compared to the same quarter last year is a function of the lower operating loss, partially offset by the increase in the non-cash loss on the change in our warrant values, as described above. Net loss for the first half of 2015 was $26.2 million, including $3.1 million in a non-cash expense described above, or $0.18 per basic and diluted share. Net loss for the first half of 2014 was $22.5 million, including a $6.4 million non-cash benefit described above, or $0.19 per basic and diluted share. The higher net loss through the first two quarters of this year compared to the same period last year is a function of the lower operating loss, which was more than offset by the non-cash loss on the change in our warrant values this year, compared to a non-cash gain last year, as described above.

As of June 30, 2015, Galena had cash and cash equivalents of $45.3 million, compared with $23.7 million as of December 31, 2014. The $21.6 million increase in cash during the first half of 2015 represents $47.4 million raised from issuance of common stock, partially offset by $23.4 million used in operating activities, a $0.5 million milestone payment for Zuplenz, and $1.9 million in debt service payments.

42.    On the same day, August 6, 2015, the Company filed its quarterly report on form 10-Q with the SEC.  The 10-Q was signed by Defendants Schwartz and Dunlap, and reaffirmed the Company's financial results announced in the press release issued on the same day.

43.    The above statements identified in ¶¶31-42 were materially false and/or misleading, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose: (1) that the Company

violated various statutes in connection with its sales of Abstral; (2) that, as such, the Company was exposed to civil and criminal liability; and (3) that, as a result of the foregoing, Defendants' statements about Galena's business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

44.     On November 9, 2015, Galena announced that it decided to divest its commercial business, which included Abstral.  As such, the Company's commercial business activities were classified as "discontinued operations," and Galena stated that it anticipated exiting the commercial business by the end of the first quarter of 2016.  In whole, Galena stated:

SAN RAMON, Calif., Nov. 9, 2015 (GLOBE NEWSWIRE) -- Galena Biopharma, Inc. (NASDAQ:GALE), a biopharmaceutical company committed to the development and commercialization of targeted oncology therapeutics that address major unmet medical needs, today reported its financial results for the quarter ended September 30, 2015. The Company also announced it has completed a strategic review of the organization and has elected to focus its efforts and financial resources exclusively on the continued development of its high value oncology pipeline led by NeuVax™ (nelipepimut-S), and divest its commercial business which consists of Abstral® (fentanyl) Sublingual Tablets and Zuplenz® (ondansetron) Oral Soluble Film.

For financial and accounting purposes, Galena has classified its commercial business activities as discontinued operations effective as of the third quarter, and the Company removes all revenue and expense guidance as it relates to its commercial business. Galena has engaged a financial advisor to provide strategic advice and a process to divest the commercial business, and the Company anticipates exiting the commercial business by the end of the first quarter of next year. Providers and patients will have ongoing access to both drugs until we have transitioned out of the business.

"Led by NeuVax, Galena has an extremely robust clinical development pipeline targeting areas of high unmet medical need that represent significant high-value market opportunities for the company," said Mark W. Schwartz, Ph.D., President & CEO. "Over the past year, we have met several key development milestones while also expanding our clinical pipeline to four assets in eight ongoing or planned clinical trials. Our strategy going forward is to advance these programs while exploring additional indications in the immuno-oncology field where our assets can potentially make a difference in the treatment of cancer or in addressing the rapidly growing patient population of cancer survivors by harnessing the power of the immune system to prevent their cancer recurrence."

Dr. Schwartz continued, "When I assumed the position of President and CEO of Galena, I, along with our executive team, began a careful examination of our operations and assets to determine the optimal strategy for Galena that would enable the greatest opportunity for growth, while maximizing shareholder value. As a result of this analysis and review by our Board of Directors, we have concluded that it is in the best interest of our patients, our shareholders, and the long-term success of our company to focus our energy and resources exclusively

on our clinical development programs. Since acquiring the products we have significantly grown the sales of Abstral and successfully launched Zuplenz, and I believe that each has strong commercial potential and offers significant benefits to their respective patient populations. However, the foundation of Galena has always been our cancer immunotherapy programs, which are now rapidly advancing towards several key inflection points. Therefore, we believe it is important for Galena to focus on our core expertise and the successful advancement of our late and mid stage clinical pipeline. We appreciate the dedication and hard work of the commercial team as we transition out of the commercial business and are extremely grateful for all of their efforts."

Dr. Schwartz concluded, "For both patients and shareholders of Galena, there is a much greater opportunity to generate value if we dedicate all of our resources to our clinical programs, and we are eager to move the company in this new direction. As part of this renewed focus, we have officially consolidated at our new headquarters in San Ramon, California. We look forward to discussing these advances in more detail during our third quarter earnings webcast this afternoon."

45.     On this news, the price of Galena common stock fell $0.19 per share, or 11%, to close at $1.53 per share on November 10, 2015.

46.     In the November 9, 2015 press release, the Company also stated:

**FINANCIAL HIGHLIGHTS AND GUIDANCE**

As a result of our strategic decision to divest our commercial business, our commercial activities are classified as discontinued operations in our third quarter financial statements.

Operating loss from continuing operations for the third quarter of 2015 was $8.6 million, including $0.6 million in stock based compensation, compared to an operating loss from continuing operations of $10.6 million, including $1.1 million in stock-based compensation for the same period in 2014. Operating loss from continuing operations through the third quarter of 2015 was $26.6 million, including $1.3 million in stock based compensation, compared to an operating loss from continuing operations of $34.2 million, including $3.9 million in stock-based compensation for the same period in 2014. The decrease in net operating loss year-over-year is primarily the result of the completion of enrollment in our Phase 3 PRESENT trial for NeuVax, as well as the decrease in stock based compensation, and a reduction in legal expenses associated with ongoing litigation and legal proceedings.

Non-operating income or expenses include non-cash charges related to changes in the fair value estimates of the company's warrant liabilities, contingent purchase price liability, and interest expense. The non-cash income related to the changes in the value of our warrant liability for the third quarter of 2015 was $2.1 million versus $6.7 million for the same period in 2014, respectively. The non-cash expense related to the changes in the value of our warrant liability through the third quarter of 2015 was $1.0 million versus a non-cash income of $13.2 million for the same period in 2014, respectively.

Loss from continuing operations for the third quarter of 2015 was $6.4 million, including $2.1 million in non-cash income described above, or $0.04 per basic and

diluted share. Loss from continuing operations for the third quarter of 2014 was $3.5 million, including a $6.7 million in non-cash income described above, or $0.03 per basic and diluted share. Loss from continuing operations through the third quarter of 2015 was $28.2 million, including $1.0 million in non-cash expense described above, or $0.18 per basic and diluted share. Loss from continuing operations through the third quarter of 2014 was $22.0 million, including $13.2 million in non-cash income described above, or $0.19 per basic and diluted share.

Loss from discontinued operations for the third quarter of 2015 was $11.7 million, or $0.07 per basic and diluted share, compared to $2.6 million, or $0.02 per basic and diluted share, for the same period of 2014. Loss from discontinued operations through the third quarter of 2015 was $16.1 million, or $0.11 per basic and diluted share, compared to $6.6 million, or $0.06 per basic and diluted share, for the same period of 2014. Loss from discontinued operations include a $8.1 million non-cash impairment charge from classification of assets held for sale for the three and nine months ended September 30, 2015.

As of September 30, 2015, Galena had cash and cash equivalents of $34.8 million, compared with $23.7 million as of December 31, 2014. The $11.1 million increase in cash through the third quarter of 2015 represents $47.4 raised from issuance of common stock, partially offset by $27.8 million used in continuing operating activities, $5.0 million used in discontinued operating activities, $0.5 million milestone payment for Zuplenz, and $3.0 million in debt service payments.

47.     On the same day, November 9, 2015, the Company filed its quarterly report on form 10-Q with the SEC.  The 10-Q was signed by Defendants Schwartz and Dunlap, and reaffirmed the Company's financial results announced in the press release issued on the same day.

48.     On November 20, 2015, the Company announced that it had sold its Abstral product to a private company in a deal valued at up to $12 million, with $8 million cash up-front, and up to $4 million in additional cash upon the achievement of certain sales milestones, effective as of November 19, 2015.  In greater part, the Company stated:

SAN RAMON, Calif., Nov. 20, 2015 (GLOBE NEWSWIRE) -- Galena Biopharma, Inc. (NASDAQ:GALE), a biopharmaceutical company committed to the development and commercialization of targeted oncology therapeutics that address major unmet medical needs, today announced the sale of its Abstral® (fentanyl) Sublingual Tablet product to a private company in a deal valued at up to $12 million, with $8 million cash upfront and up to $4 million in additional cash upon the achievement of certain sales milestones, effective as of November 19, 2015. For additional information about the transaction, please refer to the Form 8-K filed with the SEC and available on our website.

"We are pleased to complete this divestiture in a timely manner to allow us to focus our energy and resources solely on our clinical development programs as we believe this strategic shift is in the best interest of our patients, our shareholders, and the long-term success of our company," said Mark W. Schwartz, Ph.D.,

President and Chief Executive Officer of Galena Biopharma.

Mizuho Securities acted as exclusive advisor to Galena Biopharma on this transaction.

49.     On December 11, 2015, the Company announced the departure of Dunlap, effective December 31, 2015:

Mr. Ryan Dunlap, the current Chief Financial Officer (CFO) of the registrant, advised that he and his family will be unable to relocate to the Company's new headquarters' in San Ramon, California, and as a result he will leave the Company effective December 31, 2015. Mr. Dunlap indicated that he has no disagreements with management. In order to facilitate an orderly transition, the Company and Mr. Dunlap are negotiating a consulting arrangement. In connection with his departure, the Company and Mr. Dunlap are negotiating a separation agreement and general release, most of the terms of which were previously negotiated pursuant to Mr. Dunlap's Employment Agreement. The Company has instituted a search for a CFO.

50.     The above statements identified in ¶¶44, 46-49 were materially false and/or misleading, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose: (1) that the Company violated various statutes in connection with its sales of Abstral; (2) that, as such, the Company was exposed to civil and criminal liability; and (3) that, as a result of the foregoing, Defendants' statements about Galena's business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

51.     On December 22, 2015, the Company announced the receipt of a subpoena in connection with its sales of Abstral:

On December 16, 2015, Galena Biopharma, Inc. ("Galena") received a subpoena from the U.S. Attorney's Office for the District of New Jersey. The subpoena requests the production of a broad range of documents pertaining to marketing and promotional practices related to the product ABSTRAL® (fentanyl) Sublingual Tablets. Galena intends to cooperate with the government's investigation. Galena can make no assurances as to the time or resources that will need to be devoted to this inquiry or its final outcome, or the impact, if any, of this inquiry or any proceedings on Galena's business, financial condition, results of operations and cash flows.

52.     On this news, the price of Galena common stock fell $0.06 per share, or 3.6%, to close at $1.57 per share on December 23, 2015.

53.     The above statements identified in ¶51 were materially false and/or misleading, as

well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose: (1) that the Company violated various statutes in connection with its sales of Abstral; (2) that, as such, the Company was exposed to civil and criminal liability; and (3) that, as a result of the foregoing, Defendants' statements about Galena's business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

54. Then, on March 10, 2016, the Company filed its annual report on Form 10-K with the SEC. The 10-K was signed by Defendants Schwartz and Burns. Therein, the Company disclosed:

> ***We are subject to U.S. federal and state health care fraud and abuse and false claims laws and regulations, and we recently have been subpoenaed in connection with marketing and promotional practices related to Abstral. Prosecutions under such laws have increased in recent years and we may become subject to such prosecutions or related litigation under these laws. If we have not fully complied with such laws, we could face substantial penalties.***

> Our former commercial operations and development programs are subject to various U.S. federal and state fraud and abuse laws, including, without limitation, the federal False Claims Act, federal Anti-Kickback Statute, and the federal Sunshine Act.

> A federal investigation of two of the high-prescribing physicians for Abstral has resulted in the criminal prosecution of the two physicians for alleged violations of the federal False Claims Act and other federal statutes. The criminal trial is set for some time in 2016. We have received a trial subpoena for documents in connection with that investigation and we have been in contact with the U.S. Attorney's Office for the Southern District of Alabama, which is handling the criminal trial, and are cooperating in the production of documents. We are a target or subject of that investigation. There also have been federal and state investigations of a company that has a product that competes with Abstral in the same therapeutic class, and we have learned that the FDA and other governmental agencies may be investigating our Abstral promotion practices. On December 16, 2015, we received a subpoena issued by the U.S. Attorney's Office in District of New Jersey requesting the production of a broad range of documents pertaining to our marketing and promotional practices for Abstral. We have been in contact with the U.S. Attorney's Office for the District of New Jersey and are cooperating in the production of the requested documents. We are unable to predict whether we could become subject to legal or administrative actions as a result of these matters, or the impact of such matters. If we are found to be in violation of the False Claims Act, Anti-Kickback Statute, Patient Protection and Affordable Care Act, or any other applicable state or any federal fraud and abuse laws, we may be subject to penalties, such as civil and criminal penalties, damages, fines, or an administrative action of exclusion from government health care reimbursement programs. We can make no assurances as to the time or resources that will need to be devoted to these matters or their outcome, or the impact, if any, that these

matters or any resulting legal or administrative proceedings may have on our business or financial condition.

55.    On this news, the price of Galena common stock fell $0.03 per share, or 3.3%, to close at $0.86 per share on March 11, 2016.

56.    On May 10, 2016, the Company filed its quarterly report on form 10-Q with the SEC.  The 10-Q was signed by Defendants Schwartz and Burns.  Therein, the Company stated:

On March 18, 2013, we acquired Abstral® (fentanyl) sublingual tablets for sale and distribution in the United States from Orexo AB (ORX.ST), a specialty pharmaceutical company based in Sweden. Abstral has been approved by the U.S. Food and Drug Administration (FDA) and is a transmucosal immediate-release fentanyl (TIRF) product.

Under our agreement with Orexo, we assumed responsibility for the U.S. commercialization of Abstral and for all regulatory and reporting matters in the U.S. We also agreed to establish and maintain through 2015 a specified minimum commercial field force to market, sell and distribute Abstral and to use commercially reasonable efforts to reach the specified sales milestones. Orexo is entitled to reacquire the U.S. rights to Abstral from us for no consideration if we breach our obligations to establish and maintain the requisite sales force throughout the marketing period. We launched U.S. commercial sales of Abstral in the fourth quarter of 2013.

In exchange for the U.S. rights to Abstral, (1) we paid Orexo $10 million in March 2013 and a $5 million milestone payment in cash in October 2013 upon the approval by the FDA of a specified U.S. manufacturer of Abstral; and (2) we agreed to pay to Orexo: (a) three one-time future cash milestone payments based on our net sales of Abstral; and (b) a low double-digit royalty on future net sales. No further milestone or royalty payments will be due after the date on which all claims of the last remaining licensed patents expire (currently 2019) or become invalidated by a governmental agency.

On November 19, 2015, Galena Biopharma, Inc. (the "Company") and Sentynl Therapeutics Inc., a Delaware corporation ("Sentynl"), entered into and closed upon an Asset Purchase Agreement (the "Purchase Agreement"), pursuant to which the Company agreed to sell to Sentynl and Sentynl agreed to purchase from the Company, certain assets of the Company related to and including its Abstral® (fentanyl) sublingual tablets product ("Abstral"). The assets sold and assigned to Sentynl pursuant to the Purchase Agreement included all of the Company's rights and interests in the Asset Purchase Agreement by and between the Company and Orexo AB ("Orexo") dated March 15, 2013, and the License Agreement by and between the Company and Orexo dated March 18, 2013 (collectively, the "Orexo Agreements"). The Company's future obligations under the Orexo Agreements were assumed by Sentynl pursuant to such assignment. The Purchase Agreement further provides that the Company will continue to be responsible for any pre-closing liabilities and obligations related to Abstral, as well for certain channel liabilities related to Abstral for a period of time post-closing. In connection with the transactions contemplated by the Purchase Agreement, the Company assigned to Sentynl all of its rights to and interests in the Orexo Agreements. In connection with such assignment, Orexo released the

Company from any future liabilities and obligations under the Orexo Agreements.

The total potential consideration payable to the Company under the Purchase Agreement is $12 million, comprised of an $8 million upfront payment and up to an aggregate of $4 million, consisting of two one-time payments based on Sentynl's achievement of "net sales" of Abstral in amounts ranging from $25 million to $35 million.

57.     On August 9, 2016, the Company filed its quarterly report on form 10-Q with the

SEC.  The 10-Q was signed by Defendants Schwartz and Burns.  Therein, the Company stated:

On November 19, 2015, the Company and Sentynl Therapeutics Inc., a Delaware corporation ("Sentynl"), entered into and closed upon an Asset Purchase Agreement (the "Purchase Agreement"), pursuant to which the Company agreed to sell to Sentynl and Sentynl agreed to purchase from the Company, certain assets of the Company related to and including its Abstral® (fentanyl) sublingual tablets product ("Abstral"). The assets sold and assigned to Sentynl pursuant to the Purchase Agreement included all of the Company's rights and interests in the Asset Purchase Agreement by and between the Company and Orexo AB ("Orexo") dated March 15, 2013, and the License Agreement by and between the Company and Orexo dated March 18, 2013 (collectively, the "Orexo Agreements"). The Company's future obligations under the Orexo Agreements were assumed by Sentynl pursuant to such assignment. In connection with such assignment, Orexo released the Company from any future obligations under the Orexo Agreements. The Purchase Agreement further provides that the Company will continue to be responsible for any pre-closing liabilities and obligations related to Abstral, as well for certain channel liabilities and rebates related to Abstral for a period of time post-closing.

The total potential consideration payable to the Company under the Purchase Agreement is $12 million, comprised of an $8 million upfront payment and up to an aggregate of $4 million, consisting of two one-time payments based on Sentynl's achievement of "net sales" of Abstral in amounts ranging from $25 million to $35 million.

58.     The above statements identified in ¶¶54, 56-57 were materially false and/or

misleading, as well as failed to disclose material adverse facts about the Company's business,

operations, and prospects.  Specifically, Defendants failed to disclose: (1) that the Company

violated various statutes in connection with its sales of Abstral; (2) that, as such, the Company

was exposed to civil and criminal liability; and (3) that, as a result of the foregoing, Defendants'

statements about Galena's business, operations, and prospects, were false and misleading and/or

lacked a reasonable basis.

59.     On January 9, 2017, the Company filed a Form 8-K with the SEC.  Therein, the

Company disclosed:

*Abstral Investigation*

As previously disclosed, on December 16, 2015, we received a subpoena issued by the U.S. Attorney's Office for the District of New Jersey requesting the production of a broad range of documents pertaining to our marketing and promotional practices for Abstral, the commercial product we sold in the fourth quarter of 2015. We have been in contact with the U.S. Attorney's Office for the District of New Jersey and Department of Justice, and we have come understand that the investigation being undertaken by the U.S. Attorney's Office for the District of New Jersey and Department of Justice is a criminal investigation in addition to a civil investigation that could ultimately involve the Company as well as one or more current and/or former employees. Pursuant to the Company's charter, we are currently reimbursing any former and current employees' attorney's fees with respect to the investigation. We are cooperating with the civil and criminal investigation, and through our outside counsel we have recently begun preliminary discussions with the government aimed at the ultimate resolution of the investigation regarding the Company.

60.    On this news, the price of Galena common stock fell $0.04 per share, or 1.9%, to close at $2.03 per share on January 9, 2017.

61.    The above statements identified in ¶59 were materially false and/or misleading, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose: (1) that the Company violated various statutes in connection with its sales of Abstral; (2) that, as such, the Company was exposed to civil and criminal liability; and (3) that, as a result of the foregoing, Defendants' statements about Galena's business, operations, and prospects, were false and misleading and/or lacked a reasonable basis

### Disclosures at the End of the Class Period

62.    On January 31, 2017, the Company announced the resignation of Schwartz as President, CEO, and a member of the Board of Directors, stating:

SAN RAMON, Calif., Jan. 31, 2017 (GLOBE NEWSWIRE) -- Galena Biopharma, Inc. (NASDAQ:GALE), a biopharmaceutical company committed to the development and commercialization of hematology and oncology therapeutics that address unmet medical needs, today announced that the Board of Directors has entered into a separation agreement with Mark W. Schwartz, Ph.D. under which Dr. Schwartz will resign from the company and its affiliates as the President, Chief Executive Officer, and member of the Board of Directors, effective today. The Board of Directors expects to appoint an Interim Chief Executive Officer in the next couple weeks.

The Board of Directors also announced that it is in the process of engaging an independent advisory firm to evaluate strategic alternatives for the company

focused on maximizing stockholder value. Potential strategic alternatives that may be explored or evaluated as part of this review include continuing to advance the clinical programs as a stand-alone entity, a sale of the company, a business combination, merger or reverse merger, and a license or other disposition of corporate assets of the company. There is no set timetable for this process and there can be no assurance that this process will result in a transaction. While the Company evaluates its strategic alternatives, Galena's investigator-sponsored immunotherapy trials will remain ongoing. The Company is evaluating the appropriate time to commence the GALE-401 trial and anticipates making a definitive determination in the second half of 2017.

"After critical assessment of the current status of the company, we believe that it is the right time to run a strategic evaluation of our opportunities as we look to maximize value for our stockholders," said Sanford J. Hillsberg, Galena's Chairman of the Board of Directors. "We acknowledge Mark's six years of service with Galena and wish him well in his future endeavors."

63.     On the same day, *TheStreet.com* published an article on Schwartz' resignation, stating that "[t]he timing of Schwartz' exit is noteworthy given Galena's admission on Jan. 9 of a criminal investigation of the company by the U.S. Attorney's Office in New Jersey and the U.S. Department of Justice," and that "Schwartz was instrumental in Galena acquiring Abstral in 2013 and played a significant role in the drug's marketing, according to former employees."

64.     On this news, the price of Galena common stock fell $0.37 per share, or 22.4%, to close at $1.28 per share on February 1, 2017. The stock price continued to decline, falling another $0.16 per share, or 12.5%, to close at $1.12 on February 2, 2017.

## CLASS ACTION ALLEGATIONS

65.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that acquired Galena's securities between August 11, 2014, and January 31, 2017, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

66.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Galena's common stock actively traded on the

NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.  Millions of Galena shares were traded publicly during the Class Period on the NASDAQ.   As of October 31, 2016, Galena had 217,019,065 shares of common stock outstanding.  Record owners and other members of the Class may be identified from records maintained by Galena or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

67.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

68.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

69.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Galena; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

70.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually

redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

71.    The market for Galena's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, Galena's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Galena's securities relying upon the integrity of the market price of the Company's securities and market information relating to Galena, and have been damaged thereby.

72.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Galena's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Galena's business, operations, and prospects as alleged herein.

73.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Galena's financial well-being and prospects.  These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## LOSS CAUSATION

74.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

75.     During the Class Period, Plaintiff and the Class purchased Galena's securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

76.     As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Galena, their control over, and/or receipt and/or modification of Galena's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Galena, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

77.     The market for Galena's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Galena's securities traded at artificially inflated prices during the Class Period.  On August 11, 2014, the Company's stock price closed at a Class Period high of $3.06 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Galena's securities and market

information relating to Galena, and have been damaged thereby.

78.    During the Class Period, the artificial inflation of Galena's stock was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Galena's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of Galena and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

79.    At all relevant times, the market for Galena's securities was an efficient market for the following reasons, among others:

(a)    Galena stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    As a regulated issuer, Galena filed periodic public reports with the SEC and/or the NASDAQ;

(c)    Galena regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)    Galena was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

80.    As a result of the foregoing, the market for Galena's securities promptly digested

current information regarding Galena from all publicly available sources and reflected such information in Galena's stock price. Under these circumstances, all purchasers of Galena's securities during the Class Period suffered similar injury through their purchase of Galena's securities at artificially inflated prices and a presumption of reliance applies.

81.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

82.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive

officer of Galena who knew that the statement was false when made.

**FIRST CLAIM**
**Violation of Section 10(b) of The Exchange Act and**
**Rule 10b-5 Promulgated Thereunder**
**Against All Defendants**

83. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

84. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Galena's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

85. Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Galena's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

86. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Galena's financial well-being and prospects, as specified herein.

87. Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Galena's value and performance and continued substantial growth, which included the making of, or the

participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Galena and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

88.    Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

89.    Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Galena's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to

obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

90.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Galena's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Galena's securities during the Class Period at artificially high prices and were damaged thereby.

91.    At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Galena was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Galena securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

92.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

93.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

### SECOND CLAIM
#### Violation of Section 20(a) of The Exchange Act
#### Against the Individual Defendants

94.    Plaintiff repeats and realleges each and every allegation contained above as if

fully set forth herein.

95.     Individual Defendants acted as controlling persons of Galena within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

96.     In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

97.     As set forth above, Galena and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.


Dated:  February 15, 2017

                                        CARELLA, BYRNE, CECCHI,
                                        OLSTEIN, BRODY & AGNELLO, P.C.

                                        *s/ James E. Cecchi*
                                        5 Becker Farm Road
                                        Roseland, NJ 07068
                                        Tel:  (973) 994-1700
                                        Fax:  (973) 994-1744

                                        GLANCY PRONGAY & MURRAY LLP
                                        Lionel Z. Glancy
                                        Robert V. Prongay
                                        Lesley F. Portnoy
                                        Charles H. Linehan
                                        1925 Century Park East, Suite 2100
                                        Los Angeles, CA 90067
                                        Telephone:  (310) 201-9150
                                        Facsimile:   (310) 201-9160

                                        *Attorneys for Plaintiff*